# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 13, 2013 Session

## STATE OF TENNESSEE v. NASIR HAKEEM

**Appeal from the Circuit Court for Montgomery County**
**No. 41100128      John H. Gasaway, III, Judge**

---

**No. M2012-02150-CCA-R3-CD - Filed December 18, 2013**

---

The defendant, Nasir Hakeem, was convicted after a bench trial of two counts of sexual battery, a Class E felony, in violation of Tennessee Code Annotated section 39-13-505 (2010).  On appeal, he challenges the sufficiency of the convicting evidence, pointing to inconsistencies in the testimony of the State's witnesses.  After a thorough review of the record, we conclude that the evidence was sufficient to support the convictions and we accordingly affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and CAMILLE R. MCMULLEN, JJ. joined.

Stephanie D. Ritchie, Clarksville, Tennessee, for the appellant, Nasir Hakeem.

Robert E. Cooper, Jr., Attorney General & Reporter; Clark B. Thornton, Assistant Attorney General;  John W. Carney, District Attorney General; and Arthur Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The defendant was convicted of committing sexual battery against the victim,[1] a server

---

[1]It is the policy of this Court to protect the identify victims of sexual crimes.

in a restaurant owned by the defendant. The crimes occurred after the restaurant had  for the night, when the victim was alone in the dining room with the defendant.

At trial, the victim testified that around the middle of November 2010, when she was twenty-one years old, she applied for an opening for a position as a server at Tandoor, an Indian restaurant in Clarksville. The victim had previously worked at the restaurant when she was seventeen. The restaurant required servers to purchase a uniform of a black button-up shirt and black pants. On December 3, 2010, she was scheduled to work from 4:00 p.m. to 9:00 p.m. She testified that the restaurant closed at 8:00 or 8:30 p.m., but her work included cleaning up afterwards. Josh Williams was working in the kitchen as a dishwasher, but the victim did not remember whether there was another server working that night. The victim testified that she and Mr. Williams were "nice to each other" but were not close friends. At the time, they did not see each other outside of work.  The defendant, who owned the restaurant, was cooking, and the defendant's wife had been at the restaurant earlier in the evening to help cook.

The victim, who was upset that the defendant was being "mean" to her and unfair about her earnings, had texted another server that she thought the defendant was being greedy. The other server had showed the defendant the text. Accordingly, when the victim first arrived, the defendant berated her performance, and he confronted her about the text. Towards closing time, when the only people in the restaurant were Mr. Williams, who was in the kitchen, and the victim and the defendant, who were in the dining area, the defendant repeatedly told her he would give her $20 or $30 for oral sex, and she repeatedly refused. The defendant then came up behind her as she was removing her apron in the server area, and he forcefully grabbed her breasts and her vagina. She pushed him away and told him to stop. The victim texted her mother, who was five to ten minutes away, to hurry to pick her up. The front door was locked, and the defendant had to let the victim out when her mother arrived to pick her up. When the victim was walking to the front door, the defendant grabbed her breasts more forcefully than before and told her she "better not tell anybody." The victim was "freaking out and crying" when her mother picked her up and did not tell her mother what had happened for about twenty minutes. She testified that she thought the defendant was going to rape her. The victim called her best friend at the time.

On cross-examination, the victim testified that she thought the defendant's professional conduct in connection with her compensation was unfair and that she had been angry with him. The victim stated that she had not received a paycheck during her short tenure and so her only income was from tips and from $7 the defendant gave her; however, the defendant began to "take" her tables, so that her income was reduced. The victim acknowledged that on November 30, 2010, she signed a document stating that she had received all money due her up to November 30, 2010 and that the restaurant did not owe her

money at the time. She testified that she believed she had arrived at work on time on December 3rd and that her mother or friend had driven her because her car was not working. She acknowledged that the defendant was angry that she had missed work once, but did not recall meeting with him about the missed day. After the defendant berated her, she cried in the bathroom and texted her mother.

The victim testified that the grabbing did not occur until after she had "checked-out" by entering her tips into the computer and giving the defendant any money she owed. She testified that she thought the defendant was unfair that night because it had not been too busy, and the defendant had taken many of her tables. She also thought the defendant might have asked for or taken some of her tips, either on that night or a different one. She testified she gave him the tips but acknowledged being angry.

The victim testified that she did not recall Mr. Williams or the defendant's wife busing tables or on the restaurant floor that night. During the attacks, Mr. Williams was in the kitchen, which was partially visible to the server area through two windows on a push door. The victim was intent on leaving after the incident and did not call out at the time or speak to Mr. Williams about it until the next day. She telephoned him the next day, prior to the time that the police contacted Mr. Williams, to see if he had witnessed anything, and at that time, she recounted the events.

On redirect examination, the victim testified that her first server job was at Tandoor and that she believed she had quit and not been fired. She testified that customers did not have a long wait at Tandoor and that she did not recall anyone walking out because of the wait. On re-cross examination, she testified that she had been fired from Pizza Hut for forgetting to charge for a beer. She denied having been fired from Tandoor because she was handing out her phone number to customers. She acknowledged serving alcohol while she was under eighteen at Tandoor but testified that the defendant did not have a problem with that.

Cale Burney, who was dating the victim at the time, testified that he received a phone call from the victim between 8:00 and 10:00 p.m. on December 3, 2010. The victim was hysterical and crying and told Mr. Burney that the defendant had offered her money for oral sex, had tried to corner her, had touched her breasts and vagina, and then offered her money to keep quiet. Mr. Burney met the victim at her home where her mother had dropped her off. No one else was present, and Mr. Burney dialed the police and handed the phone to the victim. On cross-examination, Mr. Burney testified that the victim had previously complained that the defendant was withholding money and not paying her.

The victim's mother testified that the victim's car was not working at the time of the

crimes and that she sometimes drove the victim to or from work. The victim had been texting her mother throughout the day that she wanted to quit because the defendant wouldn't leave her alone and was yelling at her. Between 8:30 and 9:00 p.m., the victim asked her mother to pick her up immediately, saying, "I have to leave" and "I want to get out of here." The victim was crying but would only tell her mother to leave, drive, and take her home. In the car, the victim made a phone call, but the victim's mother was also talking and did not hear what the victim was saying. When they got to the victim's apartment, the victim's mother and a female roommate told her to call the police. The victim's mother knew that the victim had been grabbed but did not know the nature of the assault. The victim's mother testified that she called 911 and told them her daughter had been assaulted. According to the victim's mother, she stayed with the victim all night and went with her to the police station after an officer came out.

Josh Williams testified that on December 3, 2010, he was working from 4:00 to 9:00 p.m. at Tandoor as a prep cook and dishwasher. His job duties were performed in the kitchen, and he did not generally go out of the kitchen unless he was getting a drink. He testified that the dining area was partially visible through a small window and through the plexiglass on the doors. Mr. Williams testified that he knew the victim only through work. On December 3rd, the defendant approached Mr. Williams, and, as Mr. Williams understood it, wanted Mr. Williams to ask the victim to perform oral sex on Mr. Williams. The defendant offered to pay $20 to Mr. Williams for making the request and an additional $20 to the victim for performing the act. Confused, Mr. Williams did not respond. Mr. Williams did not see anything happen between the defendant and the victim that night. Later that night or early the next morning, the victim called him and gave him an account of what had happened.

On cross-examination, Mr. Williams testified that he could not recall if he was busing tables that night and that he only did so when it was really busy. He stated he was late to work that day because of an interview at Cracker Barrel.

The defendant testified in his own behalf. He testified that the first time the victim worked for him he had fired her after five days because she gave free beer to her friends. He hired her again in mid-November 2010. Although the victim had said she had reliable transportation, she had problems with rides to work and sometimes came really early. On December 2, 2010, the victim did not show up for her 4:00 p.m. shift, but called at around 6:00 p.m. to say that she had found a ride and could come late; the defendant told her not to come. The defendant used a computer printout to show that on December 3, 2010, the victim clocked in at 4:18 p.m. He testified she was late because she normally rode with Mr. Williams, and he could not give her a ride on that day due to his interview at Cracker Barrel. He testified that she had missed work on December 1st as well, and he spoke loudly to her

regarding her absences. His wife was also involved in reprimanding the victim. He denied using profanity and denied she was crying. The defendant testified that it was Friday, and the restaurant was busy. He acted as a server for several tables, including large groups he did not think the victim could handle. He testified that the victim was not performing her job well and that one large table walked out because the food was late.[2] The defendant testified that Mr. Williams was busing tables. At the end of the night, the victim had to share $45, almost a third of her tips, with the defendant and with Mr. Williams for their work helping with her tables.

The defendant denied offering the victim money for sex, denied offering Mr. Williams money to receive oral sex from the victim, and denied touching or grabbing her. He stated she was not crying when she left.

The defendant stated that he withheld taxes from employees' hourly pay and testified that he had paid the victim around $7.40 in wages. He later introduced the victim's paystub, which showed she was owed around $21 after taxes and changed his testimony to say that she was payed around $21, not $7.40.

On cross-examination, the defendant agreed that there were only eighteen closed checks during the five hour shift. However, he described it as busy and stated that the checks were opened in about a three-and-one-half hour timeframe.

Fanta Williams testified that she worked at Tandoor from 2009 to 2011 and that she was working the morning shift on December 3, 2010. She testified that, on one occasion, the defendant asked her to speak to the victim because her clothing was inappropriate, and the defendant was not comfortable speaking to her. Ms. Williams never witnessed the defendant behave inappropriately to the victim. She also stated that she saw the victim get a ride with Mr. Williams one time.

Ms. Williams initially testified that she was working the lunch shift on December 3, 2010, and the victim was late that day. However, her testimony also included a statement that her shift ended at 3:30 p.m., that she left the restaurant at 3:30 p.m. to go to Wal-Mart, that she returned at 4:20 p.m. to wait for the victim, and that the victim did not arrive until 6:00 p.m. Ultimately, she testified the victim was late once, but she didn't know what day.

The trial court found the defendant guilty on both counts. The defendant was

_____

[2]The computer printout of the night's transactions which the defendant used to support his testimony that customers were leaving actually shows that it was the defendant who was acting as the server to a large table of voided orders, which he testified indicated the customers had walked out.

sentenced to eighteen months' probation for each conviction, to be served concurrently. The defendant's probation contained various terms, including the requirement that the defendant register as a sex offender and a prohibition on the defendant employing minors or working outside the kitchen area of his restaurant.

The defendant's attorney did not file a motion for a new trial. The defendant now appeals the sufficiency of the evidence, asserting that discrepancies in the testimony offered at trial necessitate a finding of innocence.

## ANALYSIS

Tennessee Rule of Appellate Procedure 13(e) requires a reviewing court to set aside a finding of guilt made by a trial court or a jury "if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if "after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). On review, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences which may be drawn from that evidence. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in favor of the prosecution's theory of the case." *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007). The appellate court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A guilty verdict replaces the presumption of innocence with one of guilt, and the defendant bears the burden of demonstrating why the evidence was insufficient to support the verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

Sexual battery is defined in Tennessee Code Annotated section 39-13-505. As charged in the indictment, it is "unlawful sexual contact with a victim by the defendant or the defendant by a victim" when such contact is "accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent." T.C.A. § 39-13-505(a)(2). Sexual contact "includes the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). Intimate parts "includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or

breast of a human being." T.C.A. § 39-13-501(2).

The defendant essentially suggests that the victim, motivated by anger at her compensation, spitefully fabricated the entire incident and convinced her mother, boyfriend, and the restaurant's dishwasher to lie in order to corroborate parts of her story. He points mainly to the inconsistencies in the testimony of the victim's mother and boyfriend regarding who was at the apartment and who called the police, suggesting that they invented the facts and failed to "get their stories straight." He also emphasizes the fact that Mr. Williams did not witness the attack and that the victim recounted her story to Mr. Williams on the phone prior to the time he spoke with police.

At trial, the victim testified that the defendant offered her $20 and then $30 for a sex act, that she rejected him several times, and that the defendant then grabbed her intimate parts over her clothing multiple times. "Generally, a defendant may be convicted upon the uncorroborated testimony of one witness." *State v. Wyrick*, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). In this case, however, the State introduced certain corroborating testimony. Mr. Williams testified that on the same night, the defendant, who apparently believed Mr. Williams was close to the victim, approached Mr. Williams and made an offer to pay both Mr. Williams and the victim $20 in exchange for a sex act. The victim's boyfriend and mother both testified that the victim was crying and hysterical when she told them what happened. Defense counsel highlighted the discrepancies in the testimony of the victim's mother and boyfriend regarding the circumstances under which, over two years earlier, a call had been placed to the police. However, "the reconciliation of conflicts in the proof" is entrusted to the trier of fact. *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). This is true even if the conflicts are within the testimony of witnesses for the State. *Wilson*, 211 S.W.3d at 719 (holding that evidence was sufficient to support conviction for carjacking when the testimony of officers supported that force or intimidation was used and the testimony of the victim indicated no force or intimidation was used). This trial required the trier of fact to make a credibility determination, and in doing so the trial court chose not to credit the defendant's theory that the State's four witnesses were perjuring themselves to further a lie motivated by spite. This was the province of the trier of fact. A rational trier of fact could have found beyond a reasonable doubt that the defendant intentionally touched the victim's intimate parts for the purposes of sexual arousal or gratification, without her consent, and having reason to know she did not consent.

## CONCLUSION

Based on the foregoing, we reject the defendant's challenge to the sufficiency of the

evidence and affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE